NATIONAL MALLEABLE CASTINGS CO. et al. v. T. H. SYMINGTON CO.

(District Court, D. Maine. April 8, 1915.)

No. 705.

PATENTS &#9756;328—INFRINGEMENT—DRAFT-RIGGING FOR RAILWAY CARS.

> The Byers patent, No. 673,419, for a draft-rigging for railway cars, is for a combination of elements, all of which were old, with the exception of the pocket for housing the parts, which is the leading feature of the invention, and as described consists of a box secured to both sills, tying the sills together and spacing them. In view of the prior art, the patent is not entitled to a broad construction, nor a wide range of equivalents, and, so construed, *held* not infringed.

In Equity. Suit by the National Malleable Castings Company and Jacob J. Byers against the T. H. Symington Company. On final hearing. Decree for defendant.

Fish, Richardson, Herrick & Neave, Charles Neave, and Clarence D. Kerr, all of New York City, and George I. Haight, of Chicago, Ill., for complainants.

Edwin F. Samuels, of Baltimore, Md., and Benjamin Phillips, of Boston, Mass. (Howard R. Ives and Libby, Robinson & Ives, all of Portland, Me., of counsel), for defendant.

HALE, District Judge. This suit in equity charges infringement of letters patent No. 673,419, issued on May 7, 1901, to complainants, on the application of Jacob J. Byers, for an invention relating to draft-rigging for railway cars. In premising, complainants point out that railway cars must be capable of being coupled together to form a train, and for this purpose a coupler is provided at each end of every car— the coupler on the end of one car engaging that on the adjoining end of the next car. If each coupler were attached rigidly to its car, there would be strain and shock connected with the starting or stopping of the train; and for many years it has been the custom to have some yielding or cushioning devices between each coupler and the car to which it is attached. For this purpose a "draft-rigging" is provided at each end of every car. This includes a drawbar, carrying a coupler at its outer end, and at its inner end certain shock-absorbing mechanism, interposed between the drawbar and the parts which are rigidly connected with the car. Complainants point out that the shock-absorbing mechanism shown in the case before us consists substantially of a pair of springs arranged one above the other, between the drawbar and the parts rigidly connected with the car. Whether the car is pulled or pushed, the springs will be compressed between the drawbar and the car. and the shock of pulling or of pushing is minimized by the springs. Such devices are especially necessary upon freight cars, where great weights are drawn, and the parts are made very strong, and therefore very heavy. The devices provided in this case are heavy. The coupler weighs 300 pounds, the yoke 112 pounds, the springs 55 pounds, and the followers 60 pounds, making a total of over 700 pounds. Owing to

&#9756;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the great strain to which the draft-rigging is at times subjected, the parts, although heavy and strong, frequently break. It is of importance, then, that there be a capacity for ready replacement; and this replacement must be achieved in a limited space under the car. Complainants allege that they have brought before the court a draft-rigging adequate for the demands of the railroads and car builders, in that such rigging is of a character that it can be put in place on the car and taken down in parts; that the shock-absorbing mechanism is capable of being placed in position after the other parts of the rigging have been mounted on the car, and of being removed without disturbing the remainder of the draft-rigging. And they contend that the inventor, Byers, was the first to devise a draft-rigging presenting these capabilities.

Complainants allege infringement by the defendant of claims 1, 2, 3, 5, 6, 7, 8, and 10, those claims being as follows:

1. A draft-rigging having in combination with the drawbar a yoke, the arms of which are connected to the sides of the drawbar, springs arranged one above the other within the yoke, and followers also arranged between the arms of the yoke, said springs and followers being removable from below, independently of the drawbar, substantially as described.

2. A draft-rigging having a yoke, the arms of which are adapted to be connected to the sides of the drawbar, springs arranged one above the other between the arms of the yoke, and followers adapted to fit against the ends of both springs, and also contained between the ends of the yoke, said springs and followers being removable from below independently of the drawbar, substantially as described.

3. A draft-rigging having a pocket, lugs, extending horizontally across the pocket at the upper and lower portions thereof, respectively, followers within the pocket which bear against the lugs, and a yoke which extends within the pocket between the lugs and around the rear follower, substantially as described.

5. A draft-rigging having a yoke open at the bottom, and having a spring and followers arranged between the arms of the yoke, and a pocket within which the yoke extends, and which is also open at the bottom to permit removal of the spring and followers independently of the drawbar, substantially as described.

6. A draft-rigging having a yoke open at the bottom, and having a spring and followers arranged between the arms of the yoke, a pocket which contains the yoke, and is also open at the bottom to permit removal of the spring and followers, and a detachable closure for the opening in the pocket, substantially as described.

7. A draft-rigging having, in combination with the drawbar and spring mechanism, a yoke the arms of which are connected to the sides of the drawbar, a pocket within which the yoke extends, and a key which extends horizontally through the drawbar and yoke, and through slots in the walls of the pocket, substantially as described.

8. A draft-rigging having springs set one above the other, and a follower engaging the ends of both springs and having at the middle a stop projection which separates the springs, substantially as described.

10. A draft-rigging having springs arranged vertically, one above the other, followers, a yoke between the sides of which the springs and followers are set, said springs and followers being removable vertically from below independently of the drawbar, substantially as described.

It will be seen that claims 1, 2, and 10 are general in their scope, and describe a draft-rigging having the combination of a drawbar and yoke, springs, and followers, with the statement that the springs and followers are removable from below, independently of the drawbar.

Claim 8 is also general, and relates to a draft-rigging having springs, one above the other, and a follower engaging the ends of the springs, and having at the middle a stop projection separating the springs. Claims 3, 5, 6, and 7 are in detail. They describe a draft-rigging having a pocket, lugs extending across the pocket at the upper and lower portions of the pocket, followers within the pocket bearing against the lugs, and a yoke extending within the pocket between the lugs and around the rear follower. Claims 5 and 6 point out that the springs and followers are removable from below, independently of the draw-bar.

The specification thus points out the advantages to be derived from the invention described in the claims:

"The pocket may be cast in a single piece, and is provided with horizontal lugs which extend across the pocket, above and below, and constitute abutments for the followers which are set in the pocket. The pocket and lugs are suitably braced by metal ribs or flanges. * * * The drawbar shank is connected with the rear follower by a yoke which is fixed to the drawbar by riveting or otherwise, and extends within the pocket, between the lugs, and around the rear follower, as shown. The pocket is open at the bottom, so that the follower-plates and springs may be removed freely from within the yoke in a vertical direction without the necessity of disengaging the yoke from the drawbar, since the follower-plates are not connected with the drawbar otherwise than by being placed between the sides of the yoke. This removal is made possible by taking off a cap-plate, which closes the opening at the bottom of the pocket and is secured by bolts, and the follower-plates can then be pried out by means of a tool applied to toothed recesses formed in the edges of the follower-plates. * * * The advantages of my invention will be appreciated by those skilled in the art. The springs arranged one above the other, the pocket having horizontal lugs or abutments for the followers, the free removability of the springs and the followers from below, from between the arms of the yoke, and from the pocket, and the construction of the draft-arms, together with the other items mentioned in the claims, constitute, severally and in combination, important parts of my invention."

Complainants say that the defendant's infringement consists in an agreement made in August, 1913, to furnish specifically constructed parts, consisting of cheek-castings and spacer-blocks, to the Pressed Steel Car Company for installation on Boston & Maine cars, with the intention that the parts should be assembled in such a way as to make up the combination of the patent in suit, and that the parts as furnished were capable of use for no other purpose; that in accordance with this agreement, during March and April, 1913, the parts referred to were furnished by the defendant to the Pressed Steel Car Company, intended by the defendant to be applied to car under-framings constructed for Boston & Maine cars. Complainants rely upon this agreement to infringe as sufficient to constitute technical infringement. They urge that, if sales have not actually been made, a wrong is threatened sufficient to call for an injunction, pursuant to the familiar principle that contributory infringement is intentional aiding of one person by another in the unlawful making, or selling, of a patented invention, or of some part of a patented invention, with intent and purpose of so aiding. Bump on Patents, 294; Goodyear Shoe Machinery Co. v. Jackson, 112 Fed. 146, 148, 50 C. C. A. 159, 55 L. R. A. 692; Canda v. Michigan Malleable Iron Co., 124 Fed. 487, 489, 61 C. C. A. 194. A sharp contention is raised wheth-

er or not the facts disclose a contributory infringement, even though it should be found that the defendant did agree to sell a part of the patented invention with a purpose of aiding as alleged. For proof of the alleged agreement for contributory infringement, complainants rely upon the answers to interrogatories put by them to defendant. And accordingly the alleged infringing construction is spoken of as "the machine of the interrogatories." If this machine, when put together, shall not be found to be an infringement of complainants' patent, then, of course, no infringement is shown. The inquiry presented at the threshold of the case is therefore whether or not the construction in which the alleged contributory infringement occurs was in fact an infringing device. The complainants say that such construction—to wit, the machine of the interrogatories—was clearly an infringing structure. The defendant says that it was not. In deciding this question, much depends upon the scope to be given the Byers invention. Complainants urge that the patent should be given a broad scope; that its purpose was to effect free removability of the springs and followers from below, from between the arms of the yoke, and from the pocket. The defendant says that, in view of the prior art, the Byers patent should be limited to the construction shown in its drawings and models, and should be restricted to a rigid pocket, with lugs extending horizontally across the pocket, and should conform to the other details set out in the specification, and especially described in claims 3, 5, 6, and 7.

The device of the Byers patent, constructed in accordance with the detailed claims, consists of a box or pocket, having lugs extending horizontally across it at the upper and lower portions, having followers within the pocket which bear against the lugs, and a yoke extending between the lugs and around the rear follower. The box, or pocket, is rigid, and ties the sills together, furnishing a bearing for the followers across their upper and lower edges. Complainants' brief describes the contents of the pocket substantially thus:

"A yoke arranged horizontally with its arms at the sides of the spring, secured also, at their forward ends, to the sides of the drawbar. The cushioning mechanism consists of two springs, arranged one above the other and placed between the two followers, which are also surrounded by the yoke. The springs are separated from each other by a spacer-block which supports the upper spring, and acts as a stop to prevent too great compression of the springs. The yoke is supported in longitudinal guideways in a casting attached to the draft sills of the car. These longitudinal slots afford an extended bearing for the yoke, and prevent excessive wear on any point on the yoke, and hold it in alignment with the spring and followers. The springs, arranged one above the other, and the followers on end, may be freely inserted into the loop of the yoke vertically from below, and are retained in such position by a cover-plate which has a bearing on the bottom spring, and so holds the springs and followers in position."

Complainants speak of the pocket as a supporting casting, which as they say, quoting from Byers, "may be cast in a single piece." They contend that the pocket may be made in any number of pieces, or in any suitable form; but, if made in a single piece, this casting or pocket will tie the sills together, a very desirable function, especially with cars having wooden draft sills, or widely spaced steel sills. Although the rigid box, or pocket, is claimed to be nonessential to the opera-

tion of the draft-rigging, it is shown in the Byers construction, and is described in the specification of the patent. It is claimed that Byers solved the draft-rigging problem by devising "a construction in which the parts could be put up and taken down piecemeal, and in which the springs and followers, in particular, were very readily accessible, and could be easily removed and replaced without disturbing the remainder of the rigging." The substantial contention is made that the Byers invention is not limited to a rigid box, or to a one-piece box, or to any particular form of box or pocket, so long as it achieves the free removability of the springs and followers from below, between the arms of the yoke and from the pocket. It is not denied by the complainants but that every element in the Byers construction is old; but it is contended that his combination of these elements presents a new and useful invention.

In order to find the scope and extent of Byers' invention, it is necessary to examine the prior art. The patent to Perry, No. 228,385, issued in 1880, discloses the idea of making separate spacer-blocks and shaping them to conform to the springs. The Hinson patent, No. 625,332, issued in 1899, shows the follower and spacer-block combined in a device called a "head-block" very similar to that shown in the Byers drawing.

The Frost patents, No. 510,854, issued in 1893, and No 532,272, issued in 1895, disclose a draft-gear having a horizontal yoke, with springs and followers removable from below. The arms of the yoke are in the same horizontal plane with the openings in the top and bottom. So far as I can see, the stop castings of any of the patents referred to could be combined, without alteration, with the yoke, springs, and followers of the Frost device. Frost's structure is simple, and perhaps primitive; but it gave to the public a draft-attachment having a yoke riveted to the sides of the drawbar, having its arms at the sides and the openings vertical; the springs and followers being removable from below. They seem to me to present the elements of the Byers general claims 1, 2, and 10.

The Reagan patent in 1893, No. 491,785, sets forth that its object is "to provide a generally improved construction of draft-rigging, one of the principal advantages of which consists in the convenience it affords in separating the parts, and in their adjustment, as for removing a broken draft-spring and inserting a perfect one in its place." The specific method of removal provided by this patent lacks the convenience of the later inventions; but it shows inventive thought in this direction. This patent in its claims shows also cheek-plates in combination with draft-timbers; these plates being bolted to, and formed with, studs countersunk into the draft-timbers, and a tie plate connecting the cheek-plates at their bases.

The Simons patent of 1899, No. 627,540, discloses the idea of removing the springs and followers without disconnecting any part of the yoke. It is clear that Simons had the idea of free removability. He shows the springs and followers located in openings in the sills and removable by withdrawing them from the opening in the yoke; the guides are held by means of removable bolts. Simons' structure comprises a yoke secured to the top and bottom of the drawbar, and springs

and followers within the yoke, removable independently of the draw-bar. With the exception of the special feature of the Byers pocket, and the positioning of the Simons structure, it is difficult to see any structural difference between the device of Simons and that of Byers. The same disclosure of the idea of free removability occurs in Reagan and in some others.

The structure concerning which contributory infringement is alleged appears by the answers to the interrogatories made by the complainants to the defendant. This may be regarded as the alleged offending machine. It is said by the defendant that this structure is made under the William H. Emerick patent, issued in 1902, No. 693,-643. This patent to Emerick has already been the subject of controversy, and has lately received the consideration of the court in the Northern district of Illinois. Symington v. Miner, 216 Fed. 198. It is not shown that the record in that case bears any such relation to this record as to make it helpful in the matter now before me.

It is not necessary in the case at bar to decide whether the alleged offending device is made under the Emerick patent. That device substantially shows independent counter castings, or cheek-plates, secured to the opposite faces of the sills. Its stops engage the vertical edges of the followers only at each corner of the cheek-plate, forming ways for the yoke, and limiting the play of the followers. It is contended by the defendant that these stops or lugs, "instead of engaging the followers along their top and bottom edges, engage the upper and lower portions of the vertical edges of the followers, as do the old-fashioned cheek-plates shown in the Perry and Reagan patents, except that the defendant, in producing its cheek-plates, has cut a notch in the central portion of the vertical stop shoulder of the old-fashioned cheek-plate to provide for the passage of his yoke." It is contended, further, that the cheek-plates, "secured to the opposite sides of the sills, are not rigidly connected; for the car structure on which they are supported, while apparently rigid, is, in fact, flexible under the tremendous strains to which it is subjected." It is urged, however, by complainants, that no single pocket casting was adopted by Byers, and that his claims, therefore, cover a construction such as the defendant's in which the operative parts are arranged "in substantially the same way and perform the same functions as in Byers." It is urged by complainants, too, that defendant's structure makes a pocket as distinct as the pocket of Byers; that, inasmuch as the Byers invention is a radically new departure in the art, it is entitled to a broad range of equivalents; and that the defendant's form of structure is clearly an equivalent, even if not regarded as the very thing specified in the patent.

Upon a careful study of the prior patented art, I cannot sustain the contention that the Byers invention is a radically new departure in the draft-rigging art. Every element in the patent is old. The combination of elements for the purpose of effecting free removability of the springs and followers from below does not reveal a new purpose; for this purpose is disclosed in various patents to which I have called attention; and, although it has not been carried out with the success ascribed to the patent in suit, it has been disclosed in a sufficient degree to show inventive thought. Claims 1, 2, and 10 of the patent in suit are

vague. Claim 8 relates merely to a draft-rigging for springs, and a follower, with a stop projection between the springs. The detailed claims, namely, 3, 5, 6, and 7, relate to a pocket clearly defined as a distinct thing—a box secured to both sills, tying the sills together, and spacing them. This appears by the testimony of the expert, Mr. Livermore, and by the testimony of Byers, the inventor. So far as anything is disclosed in the record, Byers was the first to use an integral box or pocket, open at the bottom, in the manner described. The detailed claims to which I have alluded are directed to the structure shown in the patent and in the drawings, and must, I think, be limited to that structure. The separate elements named in the specification are old. The only new thing is Byers' "integral housing," which may be properly described as a box or pocket, with its horizontal stops, two at the front and two at the rear, extending across the box engaging the top and bottom edges of the followers. It is the feature of the detailed claims, and must be held to embody the sole advance which Byers has made in the art. The invention was in a crowded art, and is not entitled to a broad scope, or to carry with it a wide range of equivalents.

The record does not disclose any such commercial success of the patent in suit as to demand the special recognition of the court. It is contended by the defendant that for commercial use the complainants have adopted the defendant's structure. Whether this is so or not, it is unnecessary to decide. It is enough to say that the proofs of commercial success of the patent in suit are not persuasive.

Limiting the Byers invention as, I think, it must be limited, I find nothing in the defendant's device which should be held to infringe. I cannot hold that anything in the Byers patent enables the complainants to enjoin the defendant from using the alleged offending device, or from contributing to its sale or use. It seems clear to me that defendant's structure is not constructed according to the detailed claims of the Byers patent. It has nothing which, to my mind, should be held to be the pocket or box constituting the leading feature of the Byers invention. The use of cheek-plates and the other elements which it employs are old. Their combination in the construction of the defendant, in my opinion does not present the device described in the Byers patent and drawings. I am constrained to hold that defendant's device does not infringe the Byers patent.

Inasmuch as I have held that the patent in suit is not infringed, the result will be that the bill must be dismissed; and it is not necessary to consider other questions presented in the record.

A decree may be presented dismissing the bill, with costs for the defendant.